**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

OCT 15 2013

**MILO SHAMMAS,** )
)
**Plaintiff,** )
)
**v.** )
)
**THERESA STANEK REA,** ) **Case No. 1:13-cv-1462**
***Acting Under Secretary Of Commerce For*** )
***Intellectual Property And Acting Director*** )
***Of The United States Patent And*** )
***Trademark Office,*** )
)
**Defendant.** )
)

**MEMORANDUM OPINION**

At issue on cross motions for summary judgment in this action seeking review of a decision from the Patent and Trademark Office's ("PTO") Trial and Appeal Board ("TTAB") is whether the TTAB erred in denying registration for the term "PROBIOTIC" on the grounds that the term is generic in connection with fertilizer, and alternatively, that the term at best is descriptive and has not acquired secondary meaning. For the reasons that follow, the TTAB did not err in denying registration to plaintiff. Accordingly, plaintiff's motion for summary judgment must be denied, and defendant's motion for summary judgment must be granted.

**I.**

Plaintiff Milo Shammas, the sole owner of Dr. Earth, Inc., filed a federal trademark application on June 12, 2009 for the term PROBIOTIC in connection with fertilizer. In an Office Action on September 14, 2009, the Trademark Examining Attorney of the PTO refused to register PROBIOTIC on two grounds, stating (1) that the term PROBIOTIC is generic in

connection with fertilizer and (2) that, at most, PROBIOTIC is merely descriptive for fertilizer and has not acquired secondary meaning. Plaintiff filed a response on August 30, 2010, arguing that PROBIOTIC has acquired distinctiveness over the past 10 years. The PTO's Examining Attorney disagreed, and on February 24, 2011, issued a Final Office Action denying registration. Plaintiff then appealed this ruling to the TTAB, arguing that the PTO erred in finding the term generic, and alternatively, lacking in secondary meaning. Thereafter, on October 12, 2012, TTAB affirmed the Examining Attorney's refusal to register the term PROBIOTIC as a trademark. *In re Milo Shammas*, No. 77758863 at 13 (T.T.A.B. Oct. 25, 2012).

In affirming the Examining Attorney's denial, the TTAB found that the term was merely generic, stating that "competitors' use of the term 'Probiotics' as the technology behind their products is persuasive evidence that the relevant consumers perceive the term as generic...and that competitors need to use the term." *In re Milo Shammas*, No. 77758863 at 13. In support of this finding, the TTAB noted that "articles about soil treatment identify probiotics as...the technology or method of using friendly bacteria on the soil as an ingredient of fertilizer." *Id.* Thus, the TTAB concluded that "the relevant consumers are going to understand PROBIOTIC as the genus of goods, namely a fertilizer utilizing probiotic technology." *Id.* at 16.

Alternatively, the TTAB also found that the term PROBIOTIC, even if descriptive, has not acquired secondary meaning. In reaching this result, the TTAB noted that plaintiff "did not submit any sales figures, either in dollar or units, market share information, or advertising expenditures" to support any finding of distinctiveness. *Id.* at 18. The TTAB also noted that "the record is lacking in any media recognition regarding applicant's product and how the term PROBIOTIC points uniquely and exclusively to applicant." *Id.*

Thereafter, on December 19, 2012, Plaintiff filed this action seeking review of the TTAB's decision pursuant to 15 U.S.C. § 1071(b)(1), arguing that the TTAB erred in finding that the term PROBIOTIC is generic, and alternatively, that the term, even if descriptive, has not acquired secondary meaning. Plaintiff seeks (1) reversal of the TTAB's decision, (2) a declaration that the term PROBIOTIC is suggestive or, alternatively, that it merits registration as a distinctive trademark that has acquired secondary meaning, and (3) any other relief deemed proper.

The parties have filed cross motions for summary judgment that essentially present the following two questions: (1) whether the TTAB erred in finding that the term PROBIOTIC is generic for fertilizer, and (2) whether the TTAB erred in finding, alternatively, that the term PROBIOTIC, even if descriptive, has not acquired secondary meaning.

**II.**

The summary judgment standard is too well-settled to merit extended discussion, nor do the parties dispute this standard. Summary judgment should not be granted when the non-moving party has "set forth specific facts showing that there is a genuine issue for trial" through "affidavits or as otherwise provided." Fed. Rules Civ. P. 56. A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**III.**

Plaintiff has filed this action under 15 U.S.C. § 1071, which allows trademark applicants dissatisfied with the TTAB's decision either to appeal to the Court of Appeals for the Federal Circuit or to file an action in district court. Where, as here, the plaintiff files an action in the district court, the district court "'sits in a dual capacity,' serving on one hand as the finder of fact

with respect to new evidence presented by the parties, and on the other as an appellate reviewer of facts found by the TTAB." *Glendale Intern. Corp. v. U.S. Patent & Trademark Office*, 374 F.Supp.2d 479, 485 (E.D. Va. 2005).

When acting as an appellate reviewer in an action under § 1071(b), a district court reviews the TTAB's findings of fact deferentially and must uphold those findings of fact if they are supported by "substantial evidence" under the Administrative Procedure Act ("APA").[1] The TTAB's findings that a term is generic[2] or lacks secondary meaning[3] are both findings of fact to be reviewed for such substantial evidence.

"Substantial evidence," as stated by the Supreme Court, is "more than a mere scintilla of evidence" and requires "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *In re Pacer Technology*, 338 F.3d 1348, 1349 (Fed. Cir. 2003) (quoting *Consol. Edison v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). As the Federal Circuit has noted, "a review for substantial evidence 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decisions.'" *On-Line Careline*, 229 F.3d at 1086 (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487-88 (1951)). A finding of fact by the TTAB will not be "upset unless it is not supported by substantial evidence." *McCarthy on Trademark*, § 21:21. Moreover, "the possibility of drawing

---

[1] *See Dickinson v. Zurko*, 527 U.S. 150, 165 (1999) (holding that the proper standard of judicial review of findings of fact made by the PTO is the "substantial evidence" standard of the APA); *On-Line Careline v. America Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000) (applying *Zurko* to findings of fact made by the TTAB); *Skippy, Inc. v. Lipton Inv., Inc.*, 345 F.Supp.2d 585, 587 (E.D. Va. 2002) (stating that "the district court must...afford deference to the fact-findings of the TTAB").

[2] *In re 1800Mattress.com IP, LLC*, 586 F.3d 1359, 1361 (Fed. Cir. 2009) ("Whether an asserted mark is generic is a factual determination made by the Board.").

[3] *DuoProSS Meditech Corp. v. Inviro Medical Devices, Ltd.*, 695 F.3d 1247, 1252 (Fed. Cir. 2012); *see also McCarthy on Trademark*, § 32:119 ("Secondary meaning is an issue of fact.").

two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966)). As stated by the Federal Circuit, the TTAB's decision "may not be reversed...even if [the reviewing court] would have viewed the facts differently if sitting as the tribunal of original jurisdiction," so long as substantial evidence supports the TTAB's ruling. If the evidence before the TTAB supports two conclusions, "the Board's decision to favor one over the other...must be sustained...as supported by substantial evidence." *DuoProSS Meditech Corp.* 695 F.3d at 1252.

By contrast, when a district court in a § 1071 action acts as a finder of fact with regard to new evidence submitted by the parties, the district court must examine the evidence *de novo* and make its own findings of fact as to the generic nature of the term and its lack of secondary meaning.[4] Of course, in reviewing newly-submitted evidence, a district court must bear in mind that plaintiff has the "laboring oar to establish error by the [TTAB]" by a preponderance of the evidence, because plaintiff "does not start over to prosecute his application before the district court unfettered by what happened in the PTO." *Fregeau v. Mossinghoff*, 776 F.2d 1034, 1036-38 (Fed. Cir. 1985). Thus, plaintiff's evidence must be sufficient to establish by a preponderance of the evidence, based on the record as a whole, that the proffered mark is protectable.

Accordingly, the analysis in this case proceeds as follows: first, the TTAB's findings of fact—the TTAB's conclusion that the term PROBIOTIC is generic, and alternatively, lacks secondary meaning—must be reviewed deferentially pursuant to the substantial evidence standard. Next, the new evidence submitted by the parties must be reviewed *de novo* to

---

[4] *See Skippy*, 345 F.Supp.2d at 586 ("Review of new evidence is *de novo*."); *Glendale Intern. Corp.*, 374 F.Supp.2d at 485 (stating that "decisions of the TTAB are reviewed *de novo* with respect to conclusions of law").

determine what findings of fact are warranted by this new evidence. Finally, in the event that the new evidence warrants findings that contradict, or are inconsistent with, the TTAB's factual findings supported by substantial evidence, the district court must then consider whether the record as a whole establishes that plaintiff has borne his burden of proving by a preponderance of the evidence that the term PROBIOTIC is a protectable mark.

## IV.

The essential facts found by the TTAB are as follows:

1. The genus of the goods at issue in this case is fertilizer.
2. The relevant public, when it considers PROBIOTIC in connection to fertilizer, perceives the term to be generic for fertilizer.
3. PROBIOTIC has not acquired distinctiveness.

A review of the record before the TTAB reveals that each of these findings of fact is amply supported by substantial evidence.

First, the TTAB found that the genus of goods at issue is fertilizer. As the TTAB pointed out, the parties do not dispute this fact. *In re Milo Shammas*, No. 77758863 at 4.

Second, the TTAB found that the relevant public, when it considers PROBIOTIC in connection with fertilizer, readily understands the term to identify a type of fertilizer, and therefore, that "the relevant consumers perceive the term as generic." *Id.* at 13. In reaching this conclusion, the TTAB relied on several sources. For example, the TTAB cited to the fact that at least eight of Dr. Earth's competitors use the term "probiotic" to describe an aspect or feature of their fertilizer and soil products.[5] Additionally, the TTAB cited to several articles on third-party

[5] The third party competitors to which the TTAB cites are:

websites discussing techniques for improving soil through the use of probiotics in fertilizer.[6] Based on this evidence, the TTAB concluded that "competitors' use of the term...as the technology behind their products is persuasive evidence" of genericness, and that "the articles about soil treatment identify probiotics as soil based organisms that are beneficial bacteria that

---

- "Probiotic Fertilizer Supplements" on EarthBalance.com.
- SURYA natural probiotic fertilizer products on GardenCenterMagazine.com.
- GWhiz lawn treatment using "organic and probiotic fertilizer programs designed to reduce the build up of salts in the soil" on Marshall Pet Products' website.
- Biota Max Soil Probiotic, "an all-natural soil probiotic," on BiotaMax.com.
- A "patented fertilizer called PROBIOTIC 1F/1G" on AnConBio-Services.com.
- "Soil Probiotics" on MaterialScienceOrganics.com, marketed as scientific blends of microbes and minerals formulated to restore soil fertility...our soil probiotics are of the highest quality for organic growing.
- SCD Probiotics Soil Enrichment on SCDProbiotics.com.
- An advertisement on SoulSoup.com for its product for treating stressed tree roots: "SoulSoup Probiotic is a mildly acidic solution that is used to treat stressed tree roots."

[6] The articles to which the TTAB cites are:

- The Probiotic.com webpage entitled "Soil Probiotic" stating that "soil probiotics are commonly known as soil-based organisms (SBO's). SBOs are referred to a [sic] probiotics because they are beneficial bacteria in the soil
- An article on SeaChar.org stating that "[p]robiotics for soil is a method of using friendly bacteria on the soil to bring back the symbiotic relationships that create 'breathing' for the entire agroforest floor" and that probiotics are "[l]ive microorganisms which when administered in adequate amounts confer a health benefit on the host." The article also discusses how "probiotics [work] with biochar to sequester carbon, hold good bacteria and create a colony of microorganisms that sustainably nurture the soil and the flora."
- An article on LactoPAFI.com entitled "GregoGro Probiotic Fertilizer: Restoring the fertility of the soil" discussing the first probiotic manufacturer in the Philippines who manufactures a "probiotic natural organic fertilizer."
- An article on Energy Farms Network website entitled "All Natural, Probiotic Fertilizer" discussing a liquid "probiotic organic fertilizer" used to fertilize plants at a South American farm."
- An article on PRWeb.com entitled "Go Green Without Going Broke with New Technology – Natural, Probiotic, & Enzymatic FertilizeIt Products from the FertilizerStore.com" discussing how "probiotics and natural enzymes...give soil a probiotic jump start" and stating that "[t]he technology and use of probiotic, natural, and enzymatic products is particularly applicable to the agriculture industry."
- The InnovativeProbiotics.com website, which states that probiotics can be used in agriculture for improved crop performance, improved nutritional uptake, improved seed germination, accelerated composting, and odor control in livestock areas.

live in the soil...[demonstrate] that those writing about fertilizers perceive the term...as the technology or method of using friendly bacteria on the soil as an ingredient of fertilizer."[7] *Id.* Next, the TTAB cited to the dictionary definition of "probiotic" from MSN's Encarta online dictionary,[8] which states that probiotic means "a substance containing beneficial microorganisms: a substance containing live microorganisms in the digestive tract." Further, the TTAB also pointed to Wikipedia's page on probiotics, which states that probiotics are "live microorganisms thought to be beneficial to the host organism."[9] *Id.* Finally, the TTAB noted that even the plaintiff, at one point, seemingly conceded the generic nature of PROBIOTIC when he stated in his August 30, 2010 response to an Office Action that "some probiotic elements are present in the fertilizer [although] the word probiotic is not specific to any ingredient." *Id.* at 5. In sum, the evidence supporting the TTAB's finding of genericness is at least substantial, if not indeed compelling.

But the TTAB did not end its analysis at this point, as it might have; [10] instead, the TTAB went on to find that, even assuming, *arguendo*, that the term PROBIOTIC is descriptive, it has not acquired distinctiveness given "the nature of the subject matter...and the widespread third-

---

[7] As the leading commentator on trademark law notes, "generic use by competitors which has not been contested by plaintiff" and "generic usage in the media such as in trade journals and newspapers" are two typical sources of evidence from which the TTAB may determine that a term is generic. *McCarthy on Trademark*, § 12:13.

[8] Encarta is a digital multimedia encyclopedia published by Microsoft Corporation.

[9] Because dictionary definitions usually "reflect the public's perception of a word's meaning" and the way in which it is used, "dictionary definitions are relevant and sometimes persuasive" in determining whether a term is generic. *McCarthy on Trademark*, § 12:13.

[10] The TTAB's finding that the term was generic could have ended the inquiry because "a generic name of a product can never function as a trademark." *McCarthy on Trademark*, § 12:1.

party use of that term."[11] *In re Milo Shammas*, No. 77758863 at 17. In this regard, the TTAB noted that the plaintiff "did not submit any sales figures...market share information, or advertising expenditures,"[12] nor did plaintiff supplement the record with "media recognition regarding applicant's product[13] and how the term PROBIOTIC points uniquely and exclusively to applicant." *Id.* at 18. Thus, the TTAB concluded that plaintiff failed to produce sufficient evidence to show that the term PROBIOTIC had acquired distinctiveness. *Id.* Given the third-party evidence the TTAB cited and the lack of evidence presented by plaintiff, it is clear that substantial evidence firmly supports the TTAB's conclusion that PROBIOTIC has not acquired secondary meaning.

V.

This does not end the analysis. Because the plaintiff has chosen to sue in district court, rather than appeal to the Federal Circuit, the parties have the opportunity to introduce new evidence here not considered by the TTAB.[14] Both parties have done so, and it is now necessary to determine whether this new evidence is contrary to the findings of the TTAB on both the generic nature of the term as well as on its lack of secondary meaning, and if so, whether the

[11] Evidence that third parties use the term in question "is evidence of a lack of secondary meaning because where purchasers are faced with more than one independent user of a term... distinctiveness in one seller is lacking." *McCarthy on Trademark*, § 15:27.

[12] A company's sales figures and size are relevant to secondary meaning because "the larger a company and the greater its sales, the greater the number of people who have been exposed to this symbol as a trademark, and the greater the number of people who may associate [the term or symbol]...with a company or source." *McCarthy on Trademark*, § 15:49. But "raw sales figures need to be put into context to have any meaning." *Id.*

[13] *See, e.g., Harlequin Enterprises, Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981) (finding that "extensive unsolicited media coverage" supported a finding of secondary meaning).

[14] *See* 35 U.S.C. § 145; *Dickinson v. Zurko*, 527 U.S. at 164 (stating that review by a district court "permits the disappointed applicant to present to the court evidence that the applicant did not present to the PTO"); *Glendale* 374 F.Supp. 2d at 484 n.7.

record as a whole reflects that plaintiff has established, by a preponderance of the evidence, that the term is entitled to trademark protection. The following principles provide the lens through which the parties' new evidence must be viewed and evaluated.

**VI.**

With regard to the generic nature of a proposed mark, the Fourth Circuit has stated that a generic name "merely employs the common name of a product or service or refers to the genus of which the particular product is a species." *Retail Services, Inc. v. Freebies Publishing*, 364 F.3d 535, 538 (4th Cir. 2004) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). A generic name "is the name of a product or service itself—what it is." *McCarthy on Trademark*, § 12:1. In essence, this means that if the term PROBIOTIC answers the question "what are you," it is a generic term because it tells the buyer what the product is, not the source of the product. *Id.* Conversely, if the term PROBIOTIC answers the question "who are you" or "where do you come from," it is not a generic term because it tells the buyer the source of the product, not the nature of the product. *Id.* Accordingly, a generic term, which merely identifies the nature of the product, is the antithesis of a distinctive term and cannot be protected as a trademark or registered as one. *See Sara Lee Crop. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).

As the Federal Circuit has stated,[15] the "critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of goods or services in question." *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire*

[15] No circuit has exclusive appellate jurisdiction over trademark matters. *See CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001) (explaining that "the courts of appeal, other than the Federal Circuit, have appellate jurisdiction to review the district court's decision" in a § 1071(b) action). Accordingly, this case is governed by Fourth Circuit law. But given that the Fourth and Federal Circuits do not differ on issues of genericness and secondary meaning, decisions from both circuits are appropriately cited here.

*Chiefs, Inc.*, 782 F.2d 987, 989-90 (Fed. Cir. 1986). Furthermore, as the Fourth Circuit has noted, a term may be generic if the relevant public uses the term to identify the genus of goods or services at issue, or if it names a "distinctive characteristic" of that genus of goods or services. *Sara Lee Corp.,* 81 F.3d at 464 n.10. Thus, the term PROBIOTIC may be generic in connection with fertilizers if the relevant public uses the term to refer to fertilizers generally, or if the term does nothing more than identify a distinctive characteristic of fertilizers.

According to the Federal Circuit, a finding of genericness involves a two-step inquiry. First, a court must identify the "genus of goods or services at issue." *H. Marvin Ginn Corp.* at 990. Second, a court must determine whether "the term sought to be registered...[is] understood by the relevant public primarily to refer to that genus of goods or services." *Id.* Here, the TTAB established, and the parties do not dispute, that the "genus of goods at issue in this case is adequately defined by the description of goods—fertilizer." *In re Milo Shammas*, No. 77758863 at 4. Thus, the only disputed issue on the genericness issue is whether purchasers of fertilizers understand the term PROBIOTIC as referring on one hand to fertilizer or a distinctive characteristic of fertilizers, or on the other hand to plaintiff's product specifically.

Here, both plaintiff and defendant have offered new evidence on the issue of the relevant public's understanding of the term PROBIOTIC. Evidence relevant to such an inquiry includes competitors' use of the term, plaintiffs' own use of the term, dictionary definitions, media usage, testimony of persons in the trade, and surveys of the relevant consumers to show the state of mind of such consumers when they consider the term. *See McCarthy on Trademark*, § 12:13. To prove that the term PROBIOTIC is not generic, plaintiff has mistakenly relied on evidence of his product's alleged popularity, including market share, sales figures, and advertising expenditures. Evidence of this nature is not relevant to the genericness inquiry, but is instead

potentially relevant to the secondary meaning inquiry. To be sure, evidence of extensive advertising expenditures and product popularity may be probative of secondary meaning as it is evidence that the term may have gained recognition in the minds of the relevant consumer as to the source of a product. But such evidence is not probative of a lack of genericness because it does not show, by itself, that the putative mark does anything other than describe the genus of the product or a distinctive characteristic of the product. In any event, "generic marks cannot be protected even upon a showing of secondary meaning." *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, fn.8 (2d Cir. 1985). In other words, a term that is generic as to a product or service is simply not eligible for trademark protection. Even if plaintiff could show "acquired distinctiveness in a generic term through promotion and advertising, the generic term is still not entitled to protection because to allow protection would deprive competing manufacturers...of the right to call an article by its name." *Continental Airlines Inc. v. United Air Lines Inc.*, 53 U.S.P.Q.2d 1385 (T.T.A.B. 1999) (*citing America Online Inc. v. AT&T Corp.*, 51 U.S.P.Q.2d 1865, 1873 (E.D. Va. 1999).

Thus, the plaintiff's evidence pertinent to genericness, in the end, consists only of the testimony of three of Dr. Earth's retailers stating that they are unaware of any other producers of organic fertilizers who also use the term "probiotic" to describe their fertilizer and soil products.[16] Although testimony of persons in the trade, such as the testimony of retailers, can be persuasive evidence showing genericness or a lack thereof, it is not persuasive here because "affidavits from friendly employees and dealers are of little weight, as having the appearance of

---

[16] Plaintiff also relies on additional evidence identified for the first time in his memorandum in support of summary judgment, filed more than five months after the deadline set in the March 5, 2013 Discovery Order. Thus, this evidence is excluded as late under Fed R Civ. P. 37(b)(2)(A)(ii). Additionally, it is worth noting that much of this evidence focuses on the state of mind of the general public rather than the state of mind of the relevant consumer of fertilizer, and hence is not probative of either genericness or secondary meaning.

bias." *McCarthy on Trademark*, § 12:13. Moreover, these affidavits are effectively refuted by evidence of at least thirty-three producers using the term "probiotic" to describe their fertilizer and soil products—evidence of eight competitors to which the TTAB cited in its decision, and evidence of twenty-five more producers submitted by the defendant in this action. Evidence of over thirty competitors using the term "probiotic" to describe their fertilizer and soil products supports of a finding of genericness, and that finding is hardly challenged by retailers of fertilizer products saying they are "unaware" of these producers. In other words, the TTAB relied on a fact, whereas the affidavits proffered by plaintiff simply note that certain retailers are unaware of that fact. Evidence of existence of a fact trumps evidence of unawareness of the fact.

Nor is this a complete summary of the evidence on the genericness issue, as defendant has offered new, additional evidence on the issue as follows:

(1) dictionary definitions of the term "probiotic" as referring to "microorganisms and substances that promote the grown of microorganisms;"

(2) two patents using the term probiotic to refer to fertilizers and soils;

(3) forty-four scholarly or news articles using the term probiotic to describe the addition of microorganisms to soil and plants;

(4) twenty-five third-party websites advertising probiotic soil and fertilizer products; and

(5) several articles referring to Dr. Earth's products and allegedly using the term "probiotic" in a generic or descriptive sense.

The five additional sources submitted by defendant are strong evidence the term PROBIOTIC, in the minds of purchasers of fertilizer, describes fertilizers or a distinctive characteristic of fertilizers.

In summary, the record as a whole—the parties' newly-submitted evidence and the record before the TTAB—points convincingly to the conclusion that the term PROBIOTIC is generic. Put another way, a review of the entire record discloses that plaintiff has failed to adduce evidence that would permit a finder of fact to conclude, by a preponderance of the evidence, that the term PROBIOTIC is something other than a generic term ineligible for trademark protection.

## VI.

A finding that a term is generic necessarily precludes a finding that the term is descriptive with secondary meaning. As noted, if a term is generic, it cannot have the type of consumer recognition necessary for a finding of acquired secondary meaning. *See McCarthy on Trademark*, § 12:46. Because secondary meaning denotes evidence of trademark usage by some majority of relevant customers, "if the consuming public does perceive the symbol as designating the producer rather than the product, then the generic label has been incorrectly applied." *Id.* (*quoting Miller Brewing Co. v. Falstaff Brewing Corp.*, 503 F. Supp. 896, 907-908 (D.R.I. 1980)). Thus, assuming, *arguendo*, that the TTAB erred in finding PROBIOTIC generic in connection with fertilizer, plaintiff has also submitted new evidence to support his assertion that PROBIOTIC is descriptive with secondary meaning in connection with fertilizer and should thus be given trademark protection.

Secondary meaning is "a new and additional meaning that attaches to a non-inherently distinctive word," such as a descriptive word.[17] *McCarthy on Trademark*, § 15:1. This new meaning serves to identify the source of a product or service. Thus, a term with secondary meaning is used by the relevant public "to identify and distinguish a single commercial source."

---

[17] Descriptive marks constitute one category of terms requiring proof of secondary meaning for trademark protection. *McCarthy on Trademark*, § 15:2.

*Id.* Therefore, descriptive marks "are accorded protection only if...in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Sara Lee Corp.*, 81 F.3d at 464 (internal citations omitted).[18] In essence, secondary meaning describes "the psychological effect of trade symbols upon a buyer's mind" created by "a mental association...between the alleged mark and a single source of the product." *McCarthy on Trademark*, § 15:3. If a term has not acquired secondary meaning, "the purchaser will not make an association with a particular producer and thus will not be misled by an identical or similar mark." *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990).

Importantly, proof of secondary meaning "entails vigorous evidentiary requirements." *Id.* Evidence for such a claim may include direct evidence, such as customer surveys, or circumstantial evidence, such as input of the seller, evidence of sales volume, length of time used, and quantity and quality of the advertising and promotion. *McCarthy on Trademarks*, §15:1. The most direct, and likely most expensive, means of showing secondary meaning is a rigorously conducted customer survey that is fully consistent with statistical sampling methodology.[19] To assist district courts in evaluating whether secondary meaning exists, the

---

[18] *See also George & Co. LLC v. Imagination Entertainment Ltd.*, 575 F.3d 383, 394 (4th Cir. 2009) (stating that a descriptive term acquires secondary meaning when it "has become sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product").

[19] Several circuits have recognized that scientifically-conducted consumer surveys are exceedingly persuasive evidence of secondary meaning. *See, e.g., Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) ("An expert survey of purchasers can prove the most persuasive evidence of secondary meaning."); *Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, fn.9 (8th Cir. 1985) ("Consumer surveys are recognized...as the most direct and persuasive evidence of secondary meaning."); *Gimix, Inc. v. J S & A Group, Inc.*, 699 F.2d 901, 907 (7th Cir. 1983) ("Consumer testimony and consumer surveys are the only direct evidence on [the question of secondary meaning]); *Zatarains, Inc. v. Oak Grove*

Fourth Circuit has identified a non-exhaustive list of matters relevant to proof of secondary meaning: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) sales success, (4) unsolicited media coverage of the product, (5) attempts to plagiarize the mark, and (6) the length and exclusivity of the mark's use. *Id.* And, of course, the burden of proof to show secondary meaning is on the party seeking legal protection for the mark. *Application of Hollywood Brands, Inc.*, 214 F.2d 139 (4th Cir. 1954).

An analysis of the record evidence on secondary meaning properly begins by recalling that the TTAB, in concluding that the term PROBIOTIC has not acquired distinctiveness, noted that "applicant did not submit any sales figures...market share information, or advertising expenditures," nor did applicant submit "any media recognition regarding applicant's product and how the term PROBIOTIC points uniquely and exclusively to applicant." *In re Milo Shammas*, No. 77758863 at 18. Now, plaintiff has attempted to remedy that lack of evidence before the TTAB by relying on the following newly submitted material:

(1) Sales figures and tax returns indicating that plaintiff's company has sold over five million PROBIOTIC fertilizer products during the period from 2000-2012, resulting in seventy-four million dollars in retail sales. (Affidavit Declaration of Milad Shammas at 6-7).

---

*Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir.1983) ("[T]he authorities are in agreement that survey evidence is the most direct and persuasive way of establishing secondary meaning."). As the leading expert in trademark law points out, such evidence is an expensive way of proving secondary meaning, and "there is no obligation on the applicant to introduce survey evidence." *McCarthy on Trademark*, § 15:42. Failure to conduct a customer survey will only prove fatal if that failure leaves applicant with no real evidence on the question of secondary meaning. *See, e.g., E.T. Browne Drug Co. v. Cococare Products, Inc.*, 538 F.3d 185, 201 (3d Cir. 2008).

(2) Plaintiff's affidavit statement that his company has spent over one million dollars (or approximately 200,000 dollars annually) in marketing and advertising from 2008 to 2012. *Id.* at 7.

(3) Plaintiff's affidavit statement that Dr. Earth and six other sellers, all of whom do not use the term "probiotic" to describe their products, account for "the sale of substantially all (more than 80% and likely above 90%) of the organic soils and organic fertilizers containing beneficial microbes and/or mycorrhizae." *Id.* at 9.

(4) Three affidavits from retailers—Wade Long, Thomas Medhurst, and Rob Williams—selling PROBIOTIC Dr. Earth products, all of whom state that they are unaware of any other seller of organic fertilizer products using the term "probiotic" or "probiotics."

To be sure, evidence of sales volume, market share, and advertising expenditures may, if reliably and contextually established, have some probative value to show, circumstantially, the existence of secondary meaning. Yet, plaintiff's submissions on these topics fall far short of doing so; they fail to meet the "vigorous evidentiary requirements" necessary to show that there is a link in the minds of relevant consumers between the term PROBIOTIC and a single source of organic fertilizer containing microbes and mycorrhizae. *Perini Corp.*, 915 F.2d at 125. This is especially apparent when the administrative record and the parties' submissions are taken into account.

To begin with, plaintiff's 74 million dollars in total sales of fertilizer products over the past twelve years—roughly six million dollars per year—has little, if any, probative value on the issue of secondary meaning, as there is no clear information concerning whether these sales constitute a significant share of the national market for organic fertilizers containing microbes and mycorrhizae. Nor is this deficiency remedied by plaintiff's claim that his sales of Dr. Earth

fertilizer, along with the sales of six other sellers of organic fertilizers (who do not use the term probiotic) account for between 80 and 90 percent of the market for organic fertilizers containing microbes and mycorrhizae. There are two problems with such evidence. First, it is unclear whether plaintiff's sales are a substantial or insubstantial part of the 80 to 90 percent of the claimed market share. If plaintiff's market share is relatively small, then his evidence of sales, revenue, and market share would have little, if any, probative value on the existence of secondary meaning. The second problem is that plaintiff's statement flies in the face of record evidence of as many as thirty-two producers of organic fertilizer using the term "probiotic" to describe their product—eight producers relied on by the TTAB, and twenty-five more producers submitted by defendant in this action.

Similarly, plaintiff's advertising expenditures do little to advance the cause of establishing secondary meaning. As Professor McCarthy has noted, "mere expenditure of money [on advertising] is not, in itself, determinative of the actual result in buyers' minds."[20] Plaintiff must show that the advertising "had the desired effect of creating a secondary meaning" because, although "advertising is a relevant factor in determining whether a mark has acquired a secondary meaning, it is the effect of such advertising that is important, not its extent." *Worsham Sprinkler Co., Inc. v. Wes Worsham Fire Protection*, LLC, 419 F.Supp.2d 861, 870

---

[20] *Id.* at § 15:51. *See also E.T. Browne Drug Co. v. Cococare Products, Inc.*, 538 F.3d 185, 199 (3d Cir. 2008) (explaining that jurors would have to "make a leap of faith" to conclude that a term gained secondary meaning based solely on evidence of advertising expenditures); *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998) ("Evidence of advertising and sales is entirely circumstantial and that evidence does not necessarily indicate that consumers associate a mark with a particular source."); *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (finding that evidence of advertising expenditures was inadequate to establish secondary meaning without further evidence that such advertising was extensive); *Shoppers Fair of Ark., Inc. v. Sanders Co.*, 328 F.2d 496, 499 (8th Cir. 1964) ("[M]ere advertising, in and of itself...is not dispositive of the question of secondary meaning.").

(E.D. Va. 2006). In other words, the advertising "must cause the public to equate the mark with the source of the product." *Id.* Plaintiff has not presented evidence that his advertising has, in actuality, created a link in the buyer's mind between a single source of the product—plaintiff's fertilizers—and the term PROBIOTIC.

Finally, plaintiff has submitted affidavits from three retailers of Dr. Earth products, all of whom state that they are unaware of any other sellers in the organic fertilizer market using the term "probiotic" for their fertilizer products. As noted previously, these affidavits are unpersuasive because they merely attest to and establish the retailer's unawareness of a fact, and therefore fall short of contradicting the evidence establishing the fact. Moreover, as Professor McCarthy has noted, conclusory "opinion evidence" from friendly retailers is often biased and "does not necessarily reflect the view of the consumer class." *McCarthy on Trademark*, § 15:39.[21]

**VII.**

In sum, plaintiff's submissions on product sales, market share, advertising expenditures, and seller affidavits are collectively insufficient to satisfy plaintiff's burden to show the existence of secondary meaning. Plaintiff's submissions also fail to cast doubt both (i) on the TTAB's finding—supported by substantial evidence on the administrative record—that PROBIOTIC is generic, and (ii) on the result reached here that the record as a whole shows convincingly that the term is generic. Because defendant is entitled to judgment as a matter of law with respect to the genericness issue, it is unnecessary[22] and indeed inappropriate to decide

---

[21] The value of such affidavits from friendly business associates is similar for inquiries into both genericness and secondary meaning. *McCarthy on Trademark*, § 12:13 fn. 17.

[22] Because it is unnecessary to reach summary judgment with respect to secondary meaning, it is similarly unnecessary to confront the as-yet unsettled issue whether summary judgment is ever

whether defendant is entitled to summary judgment on the secondary meaning issue, as secondary meaning has no application to generic terms.

An appropriate Order will issue.

Alexandria, Virginia
October 15, 2013

/s/

T. S. Ellis, III
United States District Judge

---

appropriate on the question of secondary meaning. For cases in which summary judgment was found to be appropriate on the issue of secondary meaning, see *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143 (9th Cir. 1999); *Blazon, Inc. v. Blazon Mobile Homes Corp.*, 416 F.2d 598 (7th Cir. 1969); *Lewis Management Co. v. Corel Corp.*, 1995 WL 724835 (S.D. Cal. 1995); *U.S. Gold & Silver Invest., Inc. v. Director, United States Mint*, 682 F. Supp. 484 (D. Or. 1987). For cases in which summary judgment was found to be inappropriate on the issue of secondary meaning, see *Boden Products, Inc. v. Doric Foods Corp.*, 552 F. Supp. 493 (N.D. Ill. 1982); *American Hospital Supply Corp. v. Advanced Health Systems, Inc.*, 1980 WL 30345 (N.D. Ill. 1980); *Travel Magazine, Inc. v. Travel Digest, Inc.*, 191 F. Supp. 830 (S.D.N.Y. 1961).

Nor is it necessary to reach the issue of whether a jury trial is appropriate in a § 1071(b) case, as neither party requested a jury in this case. *See Har-Bur Associates v. Docktor Pet Centers, Inc.*, 678 F. Supp. 98 (E.D. Pa. 1986) (stating that the type of "mixed" review in a § 1071(b) action is "not compatible with the determination of fact issues by a jury," because in a jury trial, the jury "does not perform an appellate or reviewing function as to previously decided issues); *Millers' Mut. Ins. Ass'n. of Illinois v. Quigg*, 1987 WL 39928 (S.D. Ill. 1987). *But see Material Supply Intern, Inc. v. Sunmatch Indus. Co. Ltd.*, 146 F.3d 983 (D.C. Cir. 1998) (stating that a district court judge must first allow the jury to decide factual issues, after which the court should decide the appeal from the Board decision).